## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ABBVIE INC. (a Delaware corporation)
1 N. Weakugan Road
North Chicago, IL 60064

and

ALLERGAN, INC. (a Delaware corporation)
2525 Dupont Drive
Irvine, CA 92612

and

DURATA THERAPEUTICS, INC. (a
Delaware corporation)
200 South Wacker Drive
Suite 2550
Chicago, IL 60606

and

ABBVIE PRODUCTS LLC (a Georgia limited
liability company)
1 N. Weakugan Road
North Chicago, IL 60064

and

APTALIS PHARMA US, INC. (a Delaware
corporation)
100 Somerset Corporate Blvd.
Suite 2000
Bridgewater, NJ 08807

and

PHARMACYCLICS LLC (a Delaware limited
liability company)
1000 Gateway Blvd. South
San Francisco, CA 94080

and

**AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

No. 1:24-cv-01816-MJM

Judge Matthew J. Maddox

ALLERGAN SALES, LLC (a Delaware
limited liability company)
2525 Dupont Drive
Irvine, CA 92612

*Plaintiffs,*

v.

ANTHONY G. BROWN, in his official
capacity as ATTORNEY GENERAL OF THE
STATE OF MARYLAND
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202

and

KRISTOPHER RUSINKO, in his official
capacity as BOARD PRESIDENT OF THE
MARYLAND BOARD OF PHARMACY
Maryland Board of Pharmacy
4201 Patterson Ave., #5
Baltimore, MD 21215

and

NEIL LEIKACH, in his official capacity as a
member of the MARYLAND BOARD OF
PHARMACY
Maryland Board of Pharmacy
4201 Patterson Ave., #5
Baltimore, MD 21215

and

PEGGY GLASCOE GEIGHER, in her official
capacity as a member of the MARYLAND
BOARD OF PHARMACY
Maryland Board of Pharmacy
4201 Patterson Ave., #5
Baltimore, MD 21215

and

JENNIFER HARDEST, in her official

capacity as a member of the MARYLAND
BOARD OF PHARMACY
Maryland Board of Pharmacy
4201 Patterson Ave., #5
Baltimore, MD 21215

and

KEVIN MORGAN, in his official capacity as
a member of the MARYLAND BOARD OF
PHARMACY
Maryland Board of Pharmacy
4201 Patterson Ave., #5
Baltimore, MD 21215

and

AKESH PATEL, in his official capacity as a
member of the MARYLAND BOARD OF
PHARMACY
Maryland Board of Pharmacy
4201 Patterson Ave., #5
Baltimore, MD 21215

and

JAVIER VAZQUEZ, in his official capacity as
a member of the MARYLAND BOARD OF
PHARMACY
Maryland Board of Pharmacy
4201 Patterson Ave., #5
Baltimore, MD 21215

and

KARLA EVANS, in her official capacity as a
member of the MARYLAND BOARD OF
PHARMACY
Maryland Board of Pharmacy
4201 Patterson Ave., #5
Baltimore, MD 21215

and

BRENDA OLIVER, in her official capacity as
a member of the MARYLAND BOARD OF

PHARMACY
Maryland Board of Pharmacy
4201 Patterson Ave., #5
Baltimore, MD 21215

and

KAREN SLAGLE, in her official capacity as a
member of the MARYLAND BOARD OF
PHARMACY
Maryland Board of Pharmacy
4201 Patterson Ave., #5
Baltimore, MD 21215

and

KRISTEN FINK, in her official capacity as a
member of the MARYLAND BOARD OF
PHARMACY
Maryland Board of Pharmacy
4201 Patterson Ave., #5
Baltimore, MD 21215

and

ADEOTORO ORIAIFO, in his official
capacity as a member of the MARYLAND
BOARD OF PHARMACY
Maryland Board of Pharmacy
4201 Patterson Ave., #5
Baltimore, MD 21215

and

DAPHANIE ROBINSON, in her official
capacity as a member of the MARYLAND
BOARD OF PHARMACY
Maryland Board of Pharmacy
4201 Patterson Ave., #5
Baltimore, MD 21215

*Defendants.*

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Aptalis Pharma US, Inc., Pharmacyclics LLC, Allergan Sales, LLC (collectively "AbbVie" or "Plaintiffs"), by and through their undersigned attorneys, bring this action for declaratory and injunctive relief against the Maryland Attorney General and the Board President and Members of the Maryland Board of Pharmacy, challenging the applicability and constitutionality of Maryland H.B. 1056 (codified at Md. Health Occupations Code § 12-6C-09.1).[1]   In support, AbbVie alleges as follows:

## PRELIMINARY STATEMENT

1.      AbbVie brings this lawsuit to challenge the constitutionality of H.B. 1056, Chapter 962 of the Acts of 2024.  This statute conflicts with federal law by impermissibly adding state-law requirements for participating in the federal drug discount program established under Section 340B of the Public Health Service Act (the "340B statute").  In addition, H.B. 1056 violates the Supremacy Clause and Dormant Commerce Clause of the United States Constitution, as well as the Takings Clauses, Due Process Clauses, and Excessive Fines Clauses of both the United States and Maryland Constitutions.

## PARTIES TO THE ACTION

2.      AbbVie, Inc., a Delaware Corporation, is a global research-based biopharmaceutical company dedicated to addressing some of the world's most complex and serious diseases, and advancing medical science in areas such as immunology, oncology, and neuroscience.  Since 2012, AbbVie, Inc. has participated in the federal 340B drug discount program, helping uninsured and vulnerable patients obtain access to the medications they need.

---

[1]    AbbVie filed its Motion for Preliminary Injunction on June 22, 2024 (EFC No. 2).

AbbVie's headquarters are located in North Chicago, Illinois.  AbbVie, Inc. is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with the U.S. Department of Health and Human Services ("HHS") Health Resources and Services Administration ("HRSA").

3.      Allergan, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

4.      Durata Therapeutics, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

5.      AbbVie Products LLC, a Georgia Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

6.      Aptalis Pharma US, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

7.      Pharmacyclics LLC, a Delaware Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

8.      Previously, Warner Chilcott Corporation merged with Allergan Sales, LLC and Allergan Sales, LLC is the surviving entity. Allergan Sales, LLC, a Delaware Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

9.      Defendant Anthony G. Brown is the Attorney General of the State of Maryland. In that role, he has the responsibility and authority to enforce the laws of the state, including H.B. 1056, which makes any violation "an unfair, abusive, or deceptive trade practice," enforceable by the Attorney General.  *See* Md. Health Occ. Code § 12-6C-09.1(d)(1)(i).  This suit is brought against him solely in his official capacity.

10.      Defendant Kristopher Rusinko is the Board President of the Maryland Board of Pharmacy.   In this role, he has responsibility for enforcing H.B. 1056.  *See id.* § 12-6C-09.1(d)(1)(i)(2).  This suit is brought against him solely in his official capacity.

11.      Defendants Neil Leikach, Peggy Glascoe Geigher, Jennifer Hardesty, Kevin Morgan, Akesh Patel, Javier Vazquez, Karla Evans, Brenda Oliver, Karen Slagle, Kristen Fink, Adeotoro Oriaifo, and Daphanie Robinson are Members of the Maryland Board of Pharmacy.  In this role, they have responsibility for enforcing H.B. 1056.  *See id.* § 12-6C-09.1(d)(1)(i)(2). This suit is brought against each Member solely in his or her official capacity.

## JURISDICTION AND VENUE

12.      AbbVie's causes of action arise under 28 U.S.C. § 1331, 42 U.S.C. § 1983, and the United States Constitution and the Maryland Declaration of Rights.

13.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1343(a)(3).

14.      The Court has authority to grant injunctive and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the Court's inherent equitable powers, including the power to enjoin the actions of state officials if contrary to the United States Constitution or federal law.  *See Ex parte Young*, 209 U.S. 123, 159–60 (1908).

15.      Venue is proper in this district under 28 U.S.C. § 1391(b) because this action challenges a Maryland law that may otherwise apply to AbbVie's sale and distribution of drugs

at discounted prices under the federal 340B statute within this district.  AbbVie sells and distributes drugs to multiple 340B covered entities within this District, and these entities purport to maintain contract pharmacy arrangements.  Venue is also proper because the Defendant maintains offices, through which he would enforce the challenged law, in the cities of Baltimore, Hagerstown, Hughesville, Largo, and Salisbury within this District.

## GENERAL ALLEGATIONS

**A.    The 340B Drug Pricing Program**

16.    This case concerns section 340B of the federal Public Health Service Act, which created the federal "340B program" as part of the authority granted in the Veterans Health Care Act of 1992.  *See* 42 U.S.C. § 256b; *see also* Pub. L. No. 102-585, § 602(a), 106 Stat. 4943, 4967 (1992).

17.    The purpose of the federal 340B program is to "reduce pharmaceutical costs for safety-net medical providers and the indigent populations they serve" by creating "a low-cost source of pharmaceutical medication for the indigent patients themselves."  Connor J. Baer, *Drugs for the Indigent: A Proposal to Revise the 340B Drug Pricing Program*, 57 Wm. & Mary L. Rev. 637, 638 (2015) (footnote omitted).

18.    Before Congress created the 340B program, individual manufacturers voluntarily provided their drugs at reduced prices to institutions that served needy and vulnerable patients. In 1990, Congress passed a statute called the Medicaid Rebate Act, which had the unintended consequence of creating disincentives for manufacturers to continue providing those voluntary discounts.  H.R. Rep. No. 102-384, pt. 2, at 9–10 (1992).  Through the Veterans Health Care Act, Congress remedied that unintended disincentive and established the federal 340B program, turning the manufacturers' previous voluntary support into a federal mandate.

19.     The 340B statute requires that any manufacturer that participates in the federal Medicaid Drug Rebate Program must "offer" its covered outpatient drugs "for purchase" at deeply discounted prices to eligible "covered entities," which are disproportionate share hospitals and other service providers that are expected to serve predominantly low-income and vulnerable patients.  42 U.S.C. § 256b(a)(1).  The statute expressly limits participation in the 340B program to "covered entities."  *See id.* § 256b(a)(4).  The statute defines "covered entities" to include only organizations that predominantly serve low-income patients.  The definition includes, for example, federally qualified health centers, children's hospitals, qualifying rural hospitals, and clinics that serve vulnerable patients.  *Id.*  For-profit commercial pharmacies are not included in the statutory list of "covered entities."  *Id.*  Nor does the 340B statute include any provision authorizing covered entities to purchase manufacturers' drugs and dispense them through commercial pharmacies.  *See AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 60 (D. Del. 2021) ("It is hard to believe that Congress enumerated 15 types of covered entities with a high degree of precision and intended to include contract pharmacies as a 16th option by implication."), *aff'd sub nom. Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 703 (3d Cir. 2023).

20.     The discounted 340B price for each of the manufacturer's drugs is calculated by subtracting the drug's Medicaid unit rebate amount from its Average Manufacturer Price, as determined under the federal Medicaid Drug Rebate Program, codified at section 1927 of the Social Security Act.  42 U.S.C. § 256b(a)(1)–(2) & (b).  The resulting prices, called the 340B "ceiling prices," are significantly lower than the prices at which manufacturers sell their products to other purchasers.  For the vast majority of innovator drugs, the mandatory discounts range from at least 23.1% to more than 99.9% of the average price in the market.  *See* 42 U.S.C.

§ 1396r-8(c); 42 U.S.C. § 256b(a)(1).  Many mandatory 340B ceiling prices are as little as one penny per unit of drug.

21.    To indicate their agreement to participate in the federal 340B program and comply with its requirements, manufacturers sign a form contract with HHS, called the Pharmaceutical Pricing Agreement.  That agreement is drafted by HHS.  It has "no negotiable terms," and it "incorporate[s] statutory obligations and record[s] the manufacturers' agreement to abide by them."  *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 117–18.

22.    The Pharmaceutical Pricing Agreement ("PPA") imposes no obligation on participating manufacturers to sell discounted drugs, it merely requires manufacturers to offer them.  Nor does the PPA require manufacturers to cause their discounted drugs to be transferred to contract pharmacies.  Nor does it grant covered entities any right to obtain access to manufacturers' drugs at discounted prices through contract pharmacies.

23.    Both the PPA and the federal 340B statute are structured to prevent commercial parties from participating in the federal 340B program or profiting from the sale of manufacturers' drugs at discounted prices.  Over the past decade, however, that is exactly what has happened as a result of covered entities entering into contractual relationships with commercial pharmacies.  Under these arrangements, instead of using manufacturers' deeply discounted drugs to treat the indigent and uninsured patients that visit a covered entity and receive healthcare services from the covered entity itself, commercial contract pharmacies sell manufacturers' drugs at regular prices to pharmacy customers and then demand that their stocks be replenished with drugs purchased by the covered entity through the federal 340B program at discounted prices, pocketing the difference (the "spread") for their own financial benefit.

24.     In recent years, commercial contract pharmacies have earned annually over $3.3 billion in "spread."  *See* Eric Percher, et al., *The 340B Program Reaches a Tipping Point: Sizing Profit Flows and Potential Disruption*, Nephron Research LLC, (2020) (concluding that $3.348 billion in 340B discounts were retained as profit by contract pharmacies in 2020 alone).

25.     These abuses of the federal 340B program raise obvious concerns because the U.S. Constitution prohibits the government from forcing the transfer of property at confiscatory prices to private parties for their own private benefit.  *See* U.S. Const. amend. V.  They also violate both the letter and spirit of the federal 340B statute.  Congress designed the 340B statute with the intent that there would be a close nexus between the federal discount drug pricing program and its only valid public purpose—helping low-income and uninsured patients access medications at discounted prices.  Consistent with that intent, the statute prevents covered entities from using manufacturers' drugs to generate commercial profits or letting the drugs be transferred or sold to benefit entities outside the program.

26.     The statute expressly forbids "diversion" by prohibiting covered entities from selling or otherwise transferring any manufacturer's discounted drugs "to a person who is not a patient of the entity."  42 U.S.C. § 256b(a)(5)(B) ("With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity").

27.     The statute also prohibits covered entities from receiving or causing "duplicate discounts or rebates."  They may not obtain a 340B discount and cause a Medicaid rebate to be paid by the manufacturer for the same unit of drug.  *Id*. § 256b(a)(5)(A).

28.     The statute imposes an affirmative duty on the Secretary of HHS—through authority delegated to HRSA—to protect the program's integrity by "provid[ing] for

improvements in compliance by covered entities . . . in order to prevent diversion" and violations of the statute's duplicate discount prohibition. *Id.* § 256b(d)(2)(A).

29.    The statute provides mechanisms for resolving administrative disputes between manufacturers and covered entities through audits and a federal Administrative Dispute Resolution ("ADR") process. *See id.* § 256b(d)(l)(B)(v), (d)(3). Notably, HRSA recently issued a final rule setting forth additional details of the congressionally prescribed 340B ADR process. *See* 89 Fed. Reg. 28,643 (April 19, 2024). The final rule established a comprehensive scheme to resolve disputes between manufacturers and covered entities arising under the 340B statute. Under the rule, a "340B ADR Panel" within HRSA is tasked with resolving not only disputes about drug prices but also "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price"—the exact issue H.B. 1056 seeks to address. *See* 42 C.F.R. §§ 10.3, 10.21; *accord id.* § 10.22(c)(1) ("A manufacturer is responsible for obtaining relevant information or documents from any wholesaler or other third party that may facilitate the sale or distribution of its drugs to covered entities."); 89 Fed. Reg. at 28,649 (April 19, 2024) ("HHS agrees and has modified § 10.21(a)(1) to further explain that an overcharge claim generally includes claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price."); *id.* at 28,644 ("[T]he 340B Program is related to drug pricing and drug distribution.").

30.    The statute entrusts enforcement of the 340B statute *exclusively* to the Secretary of HHS and details what penalties may apply. *See* 42 U.S.C. § 256b(a)(5)(C)–(D), (d)(l)(B)(v), (d)(3). As the Supreme Court reasoned in *Astra*, Congress made HHS administrator of both the Medicaid Drug Rebate Program and the 340B program, and private enforcement by covered

entities "would undermine the [HHS's] efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Astra*, 563 U.S. at 119–20.

31.    The 340B statute provides no private right of action to covered entities. *Id.* at 113–14.

32.    Failure to comply with the statutory requirements under the 340B program may result in termination of the PPA (and the manufacturer's ability to participate in Medicaid), federal enforcement actions, and potentially the imposition of large civil penalties. *See id.* § 256b(a)(5)(D), (d)(1)(B)(vi), (d)(3)(A).

**B.    The Growth in Contract Pharmacy Arrangements**

33.    In 1996, HRSA issued non-binding guidance stating that the agency would not prevent covered entities *that lacked an in-house pharmacy* from entering into a contractual relationship with a *single* outside pharmacy to dispense covered outpatient drugs to the covered entity's patients. 61 Fed. Reg. 43,549 (Aug. 23, 1996). The guidance made clear that it "create[d] no new law and create[d] no new rights or duties." *Id.* at 43,550.

34.    Guidance documents, such as the 1996 guidelines, are by definition general statements of policy that are non-binding, non-enforceable, and do not create any legal rights or obligations. They are intended instead to inform the public as to how HRSA intends to exercise its enforcement discretion.

35.    In 2010, HRSA issued new non-binding guidance that radically changed how covered entities operated under the 340B program. The guidance stated, for the first time, that the agency would allow covered entities to enter into contractual relationships with an *unlimited* number of "contract pharmacies," even if the covered entity had an in-house pharmacy of its own. 75 Fed. Reg. 10,272 (Mar. 5, 2010).

36.    Like the 1996 guidance, the 2010 guidance did not impose binding obligations on manufacturers.  Indeed, HRSA again made clear that the non-binding guidance created no new rights and imposed no new obligations.  *See id.* at 10,273 ("This guidance neither imposes additional burdens upon manufacturers, nor creates any new rights for covered entities under the law").  In other words, while HRSA indicated that it would not interpret the 340B statute to prohibit covered entities from using multiple contract pharmacies, it did not purport to impose any obligation on manufacturers to transfer drugs to contract pharmacies or otherwise facilitate covered entities' use of contract pharmacies.

37.    Following issuance of the 2010 guidance, covered entities dramatically increased their use of contract pharmacies, with a recent study reporting an increase of 4,228% between 2010 and 2020.  This explosion in the use of contract pharmacies has been driven by the prospect of sharing in the outsized profit margins on manufacturer-subsidized 340B drugs.

38.    Contract pharmacies, which are predominantly large commercial pharmacy chains, do not operate like in-house pharmacies, do not themselves qualify as covered entities, and do not owe fiduciary duties to the covered entities.  The relationships between covered entities and the for-profit, commercial pharmacies are governed by arm's-length contracts. Contract pharmacies are not "agents" of the covered entities; they are merely business partners. Importantly, these arrangements do not exist outside the context of the federal 340B program, as there is no other context in which commercial pharmacies are able to share in the "spread" generated by selling manufacturers' discounted drugs to their customers at full prices.

39.    Contract pharmacy arrangements generally use one of two inventory models: (1) pre-purchased inventory or (2) replenishment.

40.     A few contract pharmacies use the pre-purchased inventory model, in which a covered entity's 340B purchased drugs are kept in stock at the contract pharmacy, and when filling prescriptions on behalf of that covered entity, the contract pharmacy uses the covered entity's 340B purchased inventory.

41.     Most contract pharmacies, however, use what is known as the "replenishment" model.    The replenishment model is, as covered entities self-describe, "an accounting mechanism" by which  they retroactively match discounts for the pharmacy with previously (full price) dispensing events to customers.  *See AbbVie et al. v. Murrill*, No. 6:23-CV-01307-RRS-CBW (W.D. La. June 6, 2024), Summ. J. Hr'g Tr. at 59-60 (Ron Connelly, counsel for the Louisiana Primary Care Association); 61 Fed. Reg. 43,549, 43,555 (Aug. 23, 1996).  In practice, the replenishment model permits the "transfer" of 340B priced drugs to contract pharmacies with the full knowledge that those drugs will be sold to any customer who comes in the door, whether 340B eligible or not.



Figure 1. Replenishment Model Step-By-Step.

11

42.     Under the replenishment model, no 340B drugs are kept in stock at the contract pharmacy.   Instead, "the pharmacy has an initial stock of drugs" obtained through ordinary commercial purchases at the non-340B price (Figure 1, step 1).  *See AbbVie et al. v. Murrill*, No. 6:23-CV-01307-RRS-CBW (W.D. La. June 6, 2024), Summ. J. Hr'g Tr. at 60 (Ron Connelly, counsel for the Louisiana Primary Care Association).   Initially, the contract pharmacy fills all prescriptions using its own non-340B purchased inventory (that is, full price inventory)— including those prescriptions issued by covered entities.   As explained below, the pharmacy determines which previous dispenses were 340B eligible.   Once sufficient eligible dispenses for a particular drug accumulate, the covered entity orders additional quantities of that drug at the federal 340B price  (Figure 1, step 6).   The covered entity directs AbbVie to transfer those drugs to the contract pharmacy to "replenish" the non-340B drugs dispensed by the contract pharmacy on the covered entity's behalf (Figure 1, step 2).   *See* ECF 3-2 at Exhibit 2 (Pedley Declaration) ¶¶ 3–11.   Sometimes the contract pharmacy actually places the order on behalf of the covered entity for more drugs at the federal 340B price.  *See id.* at Exhibit 1 (Scheidler Declaration) ¶ 12.

43.     Once the contract pharmacy receives the replenishment order, the 340B-priced drugs are "placed on the shelf, become[] 'neutral inventory,' and may be dispensed to any subsequent patient" (Figure 1, step 3).   *Id.* at Exhibit 2 (Pedley Declaration) ¶ 11.   In other words, under the replenishment model, contract pharmacies do not keep a separate inventory of 340B drugs but instead dispense drugs to both 340B and non-340B patients alike out of their general inventories.   Nor do most contract pharmacies attempt to determine prior to or at the point of sale whether the patient is eligible for a 340B discounted drug.   In almost all instances, contract pharmacies dispense the 340B-priced drugs to their customers at full price without

knowledge as to whether, at the time of dispensing, that patient is a 340B-eligible patient (Figure 1, step 4).

44.     The pharmacy or a third-party administrator ("TPA") carries out 340B determination at the back end, well after a drug has been dispensed (and likely consumed) by the patient.  This determination is made using a black box algorithm (unknown by AbbVie) based on the contract pharmacy's own criteria, without any involvement from the covered entities (Figure 1, step 5).  If those criteria are designed correctly, the post-sale determination may be able to calculate how many 340B-priced drugs AbbVie must sell.   But in reality, the contract pharmacies' criteria often include prior patients, who no longer receive the 340B discounted drugs at the pharmacy but that are included under a "once-a-patient-always-a-patient" approach, so the covered entity and its pharmacies are able to maximize the arbitrage profits from the 340B program.  As the D.C. Circuit observed, "[t]he covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate.   Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 457–58 (D.C. Cir. 2024).

45.     Aside from diversion created by the pharmacies and covered entities' use of their own distorted criteria to mark otherwise 340B-ineligible sales as deserving the federally mandated low prices, the replenishment model encourages diversion by allowing covered entities to transfer federally discounted drugs to pharmacies, who are not "a patient of the entity."  *See* 42 U.S.C. § 256b(a)(5)(B).  Although HRSA interpreted the federal 340B statute to allow the use of pharmacies, it did so because "[w]e believe that the relationship between the covered entity and the contract pharmacy is one of agency." 61 Fed. Reg. 43,549, 43,554.  Additionally, HRSA

noted that the covered entity purchases the drug, retains title and responsibility for the drug even after directing shipment to the contract pharmacy. *Id.* at 43,553.

46.    However, covered entities do not retain title to the drugs. As explained above, contract pharmacies (typically through a TPA) instruct covered entities to place orders—sometimes even placing the order itself, without going through a covered entity—of additional quantities of drugs at the discounted 340B price to "replenish" their general inventories that they will use to supply non-340B eligible sales. Significantly, as a result of such replenishment, even though the drugs are purchased by or on behalf of covered entities, contract pharmacies effectively take title to the drugs. At no point in time does a covered entity take title to the drugs under this model. AbbVie is also not aware of any instance where a contract pharmacy or covered entity represents that an agency relationship exists between them such that the contract pharmacy acts at the direction of a principal covered entity.

47.    In practice, therefore, covered entities and contract pharmacies share in the "spread" generated by selling the drugs at higher prices to pharmacy customers and/or seeking full commercial reimbursement from the patients' insurance plans. For-profit, commercial pharmacies thereby obtain significant profits from selling the 340B covered outpatient drugs that manufacturers must offer to covered entities at deeply discounted prices.

48.    By dramatically expanding the pool of individuals who can access the discounted drugs that covered entities can buy at discounted prices—including individuals who do not qualify as patients of the covered entity—covered entities and commercial pharmacies can obtain profits that extend far beyond Congress's intent when it created the 340B program. One study found that in 2018 alone, covered entities and their contract pharmacies generated more than

$13 billion in estimated gross profits from the purchase of manufacturers' drugs at mandated 340B prices.

49.    When commercial pharmacies are brought into the program, there is a significantly greater risk that manufacturers' discounted drugs will be dispensed to individuals who are not "patients" of the covered entity.    As HHS has found, contract pharmacy arrangements "create complications in preventing diversion" (for example, contract pharmacies cannot verify patient eligibility in real-time like a covered entity can).    HHS Office of Inspector General, OEI-05-13-00431, Mem. Report: *Contract Pharmacy Arrangements in the 340B Program* (2014) ("HHS Report"), at 1, available at https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf.

50.    Because contract pharmacies often dispense 340B covered outpatient drugs from the same inventory as drugs dispensed to all other customers (and seek replenishment after the fact), the opportunities for unlawful distributions to ineligible patients increases, allowing covered entities and contract pharmacies to profit from the diversion that Congress intended to prohibit.    *See* GAO, *Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*,    GAO-18-480,    at    44    (June    2018),    available    at https://www.gao.gov/assets/d18480.pdf (noting that approximately two-thirds of diversion findings in HRSA audits involved drugs distributed at contract pharmacies); *id.* at 35, 43–44 (finding 45% of covered entities that responded to a recent GAO survey admitted they do not provide any discount to patients who use their contract pharmacies; and many of the remaining 55% reported rarely giving discounts to patients obtaining medicines through contract pharmacies).

51.    Covered entities and commercial pharmacies reap windfalls from gaining access to manufacturers' drugs at deeply discounted prices under the federal 340B program, but uninsured and underinsured patients are not benefitting.  *See* HHS Report, at 2 (finding that "some covered entities in our study do not offer the discounted 340B price to uninsured patients at their contract pharmacies"); Adam J. Fein, *The Federal Program that Keeps Insulin Prices High*, Wall St. J. (Sept. 10, 2020), available at https://www.wsj.com/articles/the-federal-program-that-keeps-insulin-prices-high-11599779400 (explaining that "almost half the U.S. pharmacy industry now profits from the 340B program, which is designed as a narrow support to certain hospitals," while patients "don't benefit," even though manufacturers have "practically given the product away");Rory Martin, & Kepler Illich, *Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?*, IQVIA White Paper (Sept. 27, 2022), at 12, available at https://www.iqvia.com/-/media/iqvia/pdfs/us/white-paper/are-discounts-in-the-340b-drug-discount-program-being-shared-with-patients-at-contract-pharmacies.pdf ("The 340B Drug Discount Program as it exists today is a complex system of arbitrage . . . in which most vulnerable patients at contract pharmacies do not get drug discounts."); Lin JK, et al., *Assessment of US Pharmacies Contracted with Health Care Institutions Under the 340B Drug Pricing Program by Neighborhood Socioeconomic Characteristics*, JAMA Health Forum (Jun. 17, 2022), at 2, available at https://jamanetwork.com/journals/jama-health-forum/fullarticle/2793530 (finding that contract pharmacy growth from 2011–2019 was concentrated in affluent and predominantly White neighborhoods and that the share of 340B pharmacies in socioeconomically disadvantaged and primarily non-Hispanic Black and Hispanic/Latino neighborhoods declined).

52. While commercial pharmacies are driving massive growth in the 340B program—at double-digit annual rates—charity care by hospitals has decreased. Commentators have noted, for example, that as the 340B program has grown at a remarkable rate, the total value of hospitals' uncompensated care has significantly declined. *See* Letter from Adam J. Fein to Hon. Lamar Alexander and Hon. Greg Walden in response to request for input on 340B drug pricing program, 7–8 (Oct. 30, 2020), available at https://drugchannelsinstitute.com/files/AdamFein-DrugChannels-340B-30Oct2020.pdf; Adam J. Fein, *EXCLUSIVE: 340B Program Purchases Reach $24.2 Billion—7%+ of the Pharma Market—As Hospitals' Charity Care Flatlines*, Drug Channels (May 14, 2019), available at https://www.drugchannels.net/2019/05/exclusive-340b-program-purchases-reach.html#:~:text=May%2014%2C%202019-,EXCLUSIVE%3A%20340B%20Program%20Purchases%20Reach%20%2424.3%20Billion%E2%80%947%25%2B%20of,record%20%2424.3%20billion%20in%202018.

53. Both the New York Times and Wall Street Journal have run exposés describing the flaws in contract pharmacy arrangements, flaws that enable arbitrage and damage the very communities that the federal 340B program was designed to help. *See* Katie Thomas & Jessica Silver-Greenberg, *Profits Over Patients: How a Hospital Chain Used a Poor Neighborhood to Turn Huge Profits*, NY Times (Sept. 24, 2022), available at https://www.nytimes.com/2022/09/24/health/bon-secours-mercy-health-profit-poor-neighborhood.html (describing how one 340B hospital "has been slashing services at Richmond Community while investing in the city's wealthier, white neighborhoods, according to more than 20 former executives, doctors and nurses"); Anne Wilde Mathews et al., *Many Hospitals Get Big Drug Discounts. That Doesn't Mean Markdowns for Patients*, Wall Street Journal (Dec. 22, 2022), available at https://www.wsj.com/articles/340b-drug-discounts-hospitals-low-income-

federal-program-11671553899 ("The data show that hospitals often extend their 340B discounts to clinics in well-off communities, where they can charge privately insured patients more than those on Medicaid" which "raise questions about the program's growth and purpose").

### C.    Manufacturers' Response to HRSA's Overreach

54.    AbbVie and other manufacturers have exercised their lawful right to decline covered entity requests that manufacturers provide their discounted 340B drugs to an unlimited number of commercial pharmacies.

55.    AbbVie has implemented initiatives making clear that it will not indiscriminately accept requests that it transfer 340B discounted drugs to an unlimited number of third-party commercial contract pharmacies servicing hospital covered entities.

56.    As 340B abuse continued to grow, with covered entities purporting to require manufacturers to provide 340B drugs to an excessive number of for-profit pharmacies— sometimes located more than 100 miles from the covered entity's location—AbbVie updated its policy to place reasonable limits around provision to contract pharmacies.  Specifically, if a covered entity has its own in-house pharmacy, AbbVie's policy now is to only take orders for direct delivery to the in-house pharmacy.  However, if a covered entity does not have an in-house pharmacy capable of dispensing to outpatients, it is permitted to designate one contract pharmacy located within 40 miles of the HRSA registered covered entity parent site.  In implementing its initiatives, AbbVie has confirmed that it will continue to offer "each covered entity" the ability to "purchase" its covered outpatient drugs "at or below the applicable ceiling price" set by statute.  42 U.S.C. § 256b(a)(1).  AbbVie's policy is not only consistent with those upheld by the Third and D.C. Circuits but also gives covered entities and contract pharmacies more convenience at its own expense.  *See Sanofi Aventis*, 58 F.4th at 701; *Novartis*, 102 F.4th at 463–64.

57.     AbbVie is committed to ensuring that each hospital covered entity has at least one pharmacy location where it can receive shipments of discounted AbbVie medicines, and out of which it can dispense AbbVie's discounted 340B drugs to qualifying patients.  If a hospital covered entity is unable to identify an eligible contract pharmacy within 40 miles, AbbVie will work with the covered entity to identify a suitable alternative.

58.     In addition to AbbVie, many other pharmaceutical manufacturers have adopted policies directed at addressing abuses of the 340B program by covered entities and contract pharmacies.  Like AbbVie's, these policies do not refuse to supply drugs at discounted prices under the federal 340B program solely because the covered entity has an arrangement with a number of contract pharmacies; instead, they are directed at addressing program abuses.

**D.     Litigation in Federal Courts**

59.     HHS initially recognized that it lacked authority to compel manufacturers to transfer drugs to contract pharmacies.  *See* Tom Mirga, *HRSA Says Its 340B Contract Pharmacy Guidance Is Not Legally Enforceable*, 340B Report (July 9, 2020), available at https://340breport.com/hrsa-says-its-340b-contract-pharmacy/.   HHS then reversed its position and attempted to impose a new obligation on manufacturers.

60.     On December 30, 2020, HHS issued a final decision—labeled an "Advisory Opinion"—that for the first time ever purported to require manufacturers to facilitate the transfer of their products to for-profit commercial pharmacies.  *See* HHS, Advisory Opinion No. 20-06, Contract Pharmacies Under the 340B Program (Dec. 30, 2020), at 1, available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/340B-AO-FINAL-12-30-2020_0.pdf.   Various manufacturers brought suit in early 2021 to challenge this HHS decision.

61.    On May 17, 2021, the government sent certain manufacturers "compliance" letters purporting to enforce the 340B statute.  AbbVie received a "compliance" letter on October 17, 2022,  stating that HHS had made a final determination that AbbVie's policy violated the 340B statute by not agreeing to transfer 340B discounted drugs to unlimited contract pharmacies because "AbbVie's actions have resulted in overcharges."  *See* HHS, Compliance Letter to AbbVie        (Oct.        17,        2022),        available        at https://www.hrsa.gov/sites/default/files/hrsa/opa/programintegrity/hrsa-letter-abbvie-covered-entities.pdf.

62.    While the December 30 decision was later withdrawn following a ruling from the federal district court for the district of Delaware, *see AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47 (D. Del. 2021), the May 2021 letters were not withdrawn.

63.    Attorney General Brown filed amicus briefs on behalf of Maryland in the Third and D.C. Circuit Courts of Appeals in support of HHS, expressing his disapproval of the manufacturers' policies.  *See* Corrected Brief of Amicus Curiae States, *Novartis*, No. 21-5299 (D.C. Cir. filed May 23, 2022), Brief of Amicus Curiae, *Sanofi Aventis*, No. 21-3167 (ECF 34) (3d Cir. filed May 16, 2022).

64.    On January 30, 2023, the Third Circuit issued a decision recognizing that Congress intentionally "chose not to" impose delivery-related obligations on manufacturers, explaining that the federal 340B statute's plain text suggests that Congress intended "one-to-one transactions between a covered entity and a drug maker without mixing in a plethora of pharmacies."  *See Sanofi*, 58 F.4th at 704.

65.    The Third Circuit rejected the argument that manufacturers were not permitted to address program abuses, such as diversion and duplicate discounting, by imposing restrictions on when they will transfer drugs to commercial pharmacies.

66.    On May 21, 2024, the D.C. Circuit issued its own opinion endorsing the same view, holding that "section 340B merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount." *Novartis*, 102 F.4th at 460.  As a result, as long as a manufacturer's policy "neither precludes [it] from making a bona fide 'offer' nor increases its contract 'price'"—such as only "deliver[ing] section 340B drugs to a covered entity's in-house pharmacy or to a single contract pharmacy designated by the covered entity"— the condition is legitimate and may be enforced without running afoul of 340B.  *Id.* at 463–64.

67.    The 340B federal statute requires manufacturers to "offer . . . for purchase" covered outpatient drugs to covered entities at the federally discounted price.  *See* 42 U.S.C. § 256b(a)(1).  As confirmed by the Third and DC Circuits, the text of the statute allows manufacturers "to insist on at least some reasonable conditions" when formulating their offers. *See Novartis*, 102 F.4th at 461; *Sanofi Aventis*, 58 F.4th at 703.  The Third and DC Circuits further found that manufacturers' policies neither "preclude[] [them] from making a bona fide 'offer'" nor prevent covered entities from participating in the 340B program or entering into contractual relationships with commercial pharmacies.  *Novartis*, 102 F.4th at 464; *see also Sanofi*, 58 F.4th at 703.  Under manufacturers' policies, covered entities "can still buy and dispense unlimited discounted drugs by having them delivered to an in-house or contract pharmacy." *Sanofi*, 58 F.4th at 703.

**E.    The Maryland Law**

68.    While the federal courts were deciding that the federal 340B statute grants manufacturers the freedom to adopt policies to combat abuse of the 340B program by contract

pharmacies, Maryland turned to its own legislature to enact a law that purports to take that freedom away. This law is H.B. 1056.

69.    The text of H.B. 1056 makes clear that changing the terms of the federal 340B program is its regulatory object. Section 12-6C-09.1(a) defines the terms "340B drug" and "340B manufacturer" by referencing 42 U.S.C. § 256b, the 340B statute. In other words, the Maryland statute cannot exist except in the context of the federal 340B program.

70.    Section 12-6C-09.1(c)(1) then directly eliminates manufacturers' ability to adopt policies to prevent 340B abuse: "[A] 340B manufacturer may not directly or indirectly deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with or otherwise authorized by a covered entity to receive 340B drugs on behalf of the covered entity unless the receipt of 340B drugs is prohibited by" HHS.

71.    The statute cites no source, under the 340B statute or elsewhere, that permits Maryland to add requirements to the conditions for participating in the federal 340B program, or that authorizes Maryland to establish an enforcement process for the Attorney General to seek remedies for alleged violations of the federal 340B requirements.

72.    Section 12-6C-09.1(d)(1)(i) provides that any violation of H.B. 1056 constitutes an unfair or deceptive act or practice under "Title 13 of the Commercial Law Article . . . ." A violation subjects a manufacturer to a civil penalty of $5,000 per each violation, seemingly with no upper limit, "[i]n addition to the penalties under Title 13," which imposes up to $25,000 in civil fines for each violation (again, with no upper limit), *criminal* sanctions—including imprisonment for up to one year—costs, and injunctions. *See* Md. Health Occ. Code §§ 12-6C-09.1(d)(2)(i); Md. Code Com. Law, §§ 13-406; 13-409; 13-410; 13-411. And per § 12-6C-

09.1(d)(4), "[e]ach package of 340B drugs subject to a violation . . . shall constitute a separate violation." Section 12-6C-09.1(a)(3), in turn, defines "package" by reference to 21 U.S.C. § 360eee(11), under which each "smallest container of product introduced into commerce by the manufacturer or repackager that is intended by the manufacturer or repackager for individual sale to a dispenser" constitutes a "package" for violation purposes.

73.    Put together, H.B. 1056 authorizes the Maryland Attorney General and the Maryland Board of Pharmacy to use the full extent of their power to impose several consequences on pharmaceutical manufacturers who fail to comply with covered entities' demand that they provide 340B drugs to any "pharmacy that is under contract with or otherwise authorized … to receive 340B drugs" including fines, imprisonment, injunctions, and revocation or suspension of license. *See* Md. Health Occ. Code §§ 12-6C-09.1(c)(1), (d)(2)-(4).

74.    H.B. 1056 purports to limit its scope in subsection (b), stating that "[t]his section may not be construed to be: (1) Less restrictive than any federal law that is applicable to a person regulated by this section; or (2) In conflict with applicable federal and State laws and regulations." *Id.* § 12-6C-09.1(b). The next section then states that "[a] 340B manufacturer may limit the distribution of a 340B drug if the limitation is required under 21 U.S.C. § 355-1." *Id.* § 12-6C-09.1(c)(2).

75.    Despite stating that it should not be construed to conflict with federal law, there is no way to read H.B. 1056 in congruence with the 340B statute. There is no role for states to regulate 340B pricing and the distribution of 340B priced drugs to entities permitted as a matter of federal law to participate in the federal program and obtain access to manufacturers' drugs at discounted prices. The specific provisions of H.B. 1056 conflict with Section 340B's requirements for drug manufacturers as well as its enforcement and penalty scheme.

**STANDING**

76.    AbbVie is injured by H.B. 1056 because AbbVie is subject to the Maryland Attorney General and Maryland Board of Pharmacy's enforcement of its requirements.  Plaintiffs are signatories to 340B Pharmaceutical Pricing Agreements, and/or are successors-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

77.    AbbVie's injuries are fairly traceable to H.B. 1056 because the statute seeks to impose new state law obligations on drug manufacturers participating in the 340B program beyond those required by the federal statute.  Neither section 340B, nor any existing regulation, nor the Pharmaceutical Pricing Agreement, contains these requirements.  Moreover, H.B. 1056 purports to grant the Maryland Attorney General authority to enforce it in a way that violates federal law and would infringe on AbbVie's property rights.  As a result of H.B. 1056, AbbVie is exposed to state enforcement actions and state remedies, including monetary penalties.

78.    A favorable ruling is likely to address AbbVie's injuries.  Enjoining the provisions of H.B. 1056 that apply to pharmaceutical manufacturers or enjoining the enforcement of these provisions would redress AbbVie's injuries because AbbVie would not be exposed to state-imposed penalties for exercising its rights under the 340B program and the Constitution.  Similarly, a declaratory judgment would redress AbbVie's injuries because AbbVie would not be exposed to enforcement actions and accumulating penalties.

**BASIS FOR INJUNCTIVE RELIEF**

79.    Harm is irreparable "where no remedy is available at the conclusion of litigation." *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019).  Moreover, where costs are not recoverable because the government-defendant enjoys sovereign immunity from monetary damages, irreparable harm generally exists.  *See Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 500 (D. Md. 2020); *see also Ala. Ass'n of*

*Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) ("The moratorium [on collecting rent during COVID-10 pandemic] has put the applicants, along with millions of landlords across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery.").

80.     Forcing AbbVie to be subjected to state administrative enforcement proceedings that are preempted by and in conflict with federal law would impose irreparable harm on AbbVie. *See Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) ("[T]he prospect of an unconstitutional enforcement supplies the necessary irreparable injury." (internal quotations omitted)).

81.     Moreover, if H.B. 1056 is not enjoined as applied to AbbVie, AbbVie would be exposed to additional state law requirements as a condition of participating in the federal 340B program and would risk violating H.B. 1056 simply by performing its federally mandated functions.   A party may be irreparably injured in the face of the threatened enforcement of a preempted law. *See, e.g.*, *Air Evac EMS., Inc. v. Dodrill*, 548 F. Supp. 3d 580, 594 (S.D. W.Va. 2021) ("If HB 2776 goes into effect as scheduled, the Court believes that Plaintiff is likely to suffer irreparable harm—particularly if, ultimately, the Court later determines that HB 2776 is fully preempted by the ADA or otherwise unenforceable.").

82.     If drug manufacturers such as AbbVie are required to provide their drugs to an unlimited number of contract pharmacies, the magnitude of the economic loss is beyond the capacity of Maryland to compensate with damages.   Discounted purchases under the program reached approximately $44 billion for fiscal year 2021. *See* HRSA, *2021 340B Covered Entity Purchases*, available at https://www.hrsa.gov/opa/updates/2021-340B-covered-entity-purchases. Maryland anticipates a total revenue of approximately $60.9 billion for the fiscal year of 2024

but expects to spend $59.4 billion of it.[2]   The ordinary legal remedy of damages would be insufficient to cover AbbVie's losses.  *See Eastern Enters. v. Apfel*, 524 U.S. 498, 521 (1998) (plurality op.) (noting that the Supreme Court has considered injunctive relief where there is a "lack of a compensatory remedy").

83.    Prospective injunctive relief is appropriate because of the ongoing nature of the infringement of constitutional rights resulting from H.B. 1056.  The law deprives AbbVie and other manufacturers of their federal rights under the actual terms of the 340B program. H.B. 1056 threatens to impose significant penalties upon manufacturers if they do not capitulate to Maryland's attempt to modify the terms of that federal program.  And a taking occurs each and every time that a drug manufacturer is required against its own volition to transfer its drugs at the 340B discount price to a commercial pharmacy for the private benefit of that pharmacy. The deprivation of constitutional rights constitutes irreparable injury for purposes of a preliminary injunction.  *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (citing Wright & Miller, Federal Practice and Procedure § 2948.1 n. 26 (2d ed. 1995) (collecting cases)); *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) ("[T]he denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction.").

84.    Granting injunctive relief here would not harm the State.  It is well settled that a State "is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions."  *Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir.

---

[2]    *See Fiscal Digest of the State of Maryland for the Fiscal Year 2024 Including Revenues and Appropriations with Explanatory and Supplemental Statements* at B.7, available at https://dbm maryland.gov/budget/FY2024FiscalDigest/Exhibit-B-ER-for-FD-FY24.pdf; *Operating Budget broken down by Category*, available at https://maryland-dbm.budget.socrata.com/#!/year/2024/operating/0/category_title?vis=barChart.

2011); *accord Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (noting the same and that "[i]f anything, the [likely unconstitutional] system is improved by such an injunction"). Moreover, there is no evidence that uninsured and needy patients—in Maryland or anywhere else—benefit from the use of contract pharmacies, and Maryland has no legitimate interest in enriching commercial pharmacies at the expense of manufacturers and patients.

85.     Granting injunctive relief would be in the public interest. First, the public has no legitimate interest in enforcing unconstitutional laws. To the contrary, the public has a strong interest in enforcing federal law and not permitting states to change the requirements for participation in federal healthcare programs. The public also has a strong interest in preventing states from imposing unconstitutional requirements that force the transfer of private property for the private benefit of private commercial parties.

## FIRST CLAIM FOR RELIEF

### *Federal Preemption Under*
### *the Supremacy Clause, U.S. Const. art. VI, cl. 2*

86.     AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

87.     Under the Supremacy Clause of the Constitution, federal law is "supreme . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "As a result, federal statutes and regulations properly enacted and promulgated can nullify conflicting state or local actions." *Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595 (4th Cir. 2005) (internal quotations omitted).

88.     Preemption can take multiple forms: "express preemption, field preemption, and conflict preemption." *W. Star Hosp. Auth. Inc. v. City of Richmond, Va.*, 986 F.3d 354, 360 (4th Cir. 2021) (internal quotations omitted).

89.     Field preemption occurs when "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, 336 (4th Cir. 2023) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)) (internal quotations omitted).  Field preemption also occurs where Congress intends "to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona v. United States*, 567 U.S. 387, 401 (2012).

90.     The 340B program is a comprehensive federal healthcare program.  Every detail of the 340B program is determined by federal law, including which entities are eligible to participate in the program and the consequences for participating manufacturers who fail to comply with the 340B statute's requirements.  H.B. 1056 was enacted in response to manufacturers' policies, which according to HRSA and HHS result in overcharges.  But the statute does not authorize state regulation concerning 340B pricing and who is entitled to access manufacturers' drugs at discounted 340B prices.  It leaves no room for states to interfere with the carefully designed 340B program.

91.     It is foundational constitutional law that States may not use their police power to regulate Congress's creations.  *See McCulloch v. Maryland*, 17 U.S. 316 (1819) (Marshall, C.J.). A state law may not change the conditions for participation in the federal Medicare and Medicaid programs.  Any attempt by Maryland to regulate in this area impermissibly changes the requirements for participating in the federal 340B program and nullifies the "natural effect" of federal law.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000).  H.B. 1056 attempts to force manufacturers to impose specific terms as part of the offers that they are federally required to make.

92.     Conflict preemption occurs where it is impossible for a private party to comply with both state and federal law and also where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 372–73.

93.     The replenishment model results in diversion, which the federal statute forbids. Thus, H.B. 1056 is preempted to the extent it protects the use of the replenishment model, a practice clearly in conflict with Congress' mandates.

94.     H.B. 1056 purports to grant the Maryland Board of Pharmacy and Attorney General a substantive role in the 340B program's administration and enforcement, despite and in conflict with the comprehensive compliance and enforcement regime Congress provided.  The Maryland Board of Pharmacy and Attorney General are not the entities Congress tasked with enforcement of the 340B statute.  "Congress . . . made HHS administrator of the interdependent Medicaid Rebate Program and 340B Program." *Astra*, 563 U.S. at 120.  State enforcement "would undermine the agency's efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.*

95.     Congress not only defined who was entitled to administer the 340B program (the Secretary of HHS, who has lawfully delegated the authority to HRSA), it also delineated which tools were available to the Secretary to ensure compliance.  The 340B statute defines which audit procedures and ADR mechanisms are available under the 340B program for handling disputes among manufacturers and covered entities concerning program compliance.  *See* 42 U.S.C. § 256b(d)(l)(B)(v), (d)(3).  Likewise, Congress outlined the penalties that apply to manufacturers who violate the statutory requirements under the 340B program and engage in "overcharging." *See* 42 U.S.C. § 256b(d)(l)(B)(vi), (d)(2)(B)(v).  H.B. 1056's attempts to install an alternative

compliance and enforcement regime, with different regulators and distinct penalties, conflicts with the procedures detailed in the 340B statute and the lawfully promulgated federal rules implementing the statute.

96.     Maryland also has no lawful authority to force manufacturers to transfer their drugs under the 340B program at deeply discounted prices to any entity, let alone commercial pharmacies that do not qualify as covered entities under the program.  The carefully delineated obligation for manufacturers to offer 340B priced drugs to covered entities is lawfully imposed by federal law solely as a condition of a manufacturer's participation in federal healthcare programs.  To the extent that Maryland seeks to impose, through H.B. 1056, any substantive obligation on manufacturers beyond what federal law requires, that state law obligation is preempted by federal law.

### SECOND CLAIM FOR RELIEF

#### Prospective Injunctive Relief and Declaratory Relief – Violation of Takings Clause, U.S. Const. art. I, § 10, cl. 1

97.     AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

98.     The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation."  U.S. Const. amend V.; *see also Chicago, Burlington & Quincy Ry. Co. v. City of Chicago*, 166 U.S. 226 (1897) (incorporating and making applicable to states the Takings Clause of the Fifth Amendment through the Due Process Clause of the Fourteenth Amendment).

99.     The Takings Clause extends to both real and personal property.  *Horne v. Dep't of Agric.*, 576 U.S. 350, 358 (2015).  It is not limited to instances when the government physically appropriates property for its own use through eminent domain.  A taking can also occur through

legislation and regulation that sufficiently deprives a user of its property rights.  *See E. Enters.*, 524 U.S. at, 529.

100.    Under the Constitution, the government has no authority to force A-to-B transfers of private property for the benefit of private parties.  *See Kelo v. City of New London*, 545 U.S. 469, 477 (2005) (explaining that "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation"). Such private takings are always unconstitutional, since "[n]o amount of compensation can authorize such action."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005); *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388 (1798) ("[i]t is against all reason and justice" to allow government to "take[] property from A. and give[] it to B").

101.    "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred."  *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149(2021).  Statutes or regulations that mandate the physical transfer of personal property from one private party to another private party amount to an unconstitutional taking with or without just compensation.

102.    H.B. 1056 appropriates AbbVie's property rights in its drugs for the private benefit of for-profit, commercial pharmacies.  If Maryland requires manufacturers to offer their drugs to covered entities at below-market prices, mandating the inclusion of terms not agreeable to AbbVie as part of its offers, then Maryland is engaged in an impermissible *per se* violation of the Constitution's Takings and Due Process Clauses.  By defining a "340B drug'" as including those that "would have been purchased but for" the policies of manufacturers like AbbVie, Maryland understands itself to be transferring property in the possession of AbbVie to other private entities for the benefit of the latter. *See* Md. Health Occ. Code § 12-6C-09.1(A)(4)(ii).

103.    In the alternative, Maryland effectuates a partial regulatory taking.

104.    In *Penn Central Transportation Corp. v. New York City*, 438 U.S. 104, 124 (1978), the Supreme Court recognized that a regulatory taking requires consideration of a flexible three-factor test: (1) the economic impact of the regulation, (2) the extent to which the regulation has interfered with investment backed expectations, and (3) the "character of the governmental action."

105.    H.B. 1056's purported requirement that manufacturers transfer their drugs to commercial pharmacies is constitutionally impermissible because it imposes significant financial losses on AbbVie and other manufacturers, interferes with drug manufacturers' reasonable investment backed expectations, and serves no valid government purpose because it deprives manufacturers of the full use and control of their property on a continual basis for the commercial benefit of private parties.

### THIRD CLAIM FOR RELIEF

*Prospective Injunctive Relief and Declaratory Relief –*
*Violation of the Dormant Commerce Clause*

106.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

107.    Maryland's H.B. 1056 runs afoul of the U.S. Constitution's Dormant Commerce Clause because it purports to "directly regulate[] out-of-state transactions by those with *no* connection to the state."   *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023); *see also Ass'n for Accessible Medicines v. Frosh*, 887 F.3d 664, 671 (4th Cir. 2018) (striking down a Maryland law that could be triggered by "a transaction that did not result in a single pill being shipped to Maryland" and had the potential to affect purely out-of-state commerce).

108.    H.B. 1056 does not restrict itself to transactions occurring with Maryland.  In fact, its relevant statutory terms are defined—if at all—*solely* by reference to federal law. Section 12-

6C-09.1(a)(5) defines "340B manufacturer" simply as "a manufacturer . . . that has signed a pharmaceutical pricing agreement under 42 U.S.C. § 256b(a)(1)." Then, § 12-6C-09.1(a)(2) defines "covered entity" only by reference to § 256b(a)(4), which, in turn, provides fifteen subcategories that could constitute a "covered entity," none of which, predictably, are limited to those located in Maryland. Other terms, like "pharmacy," go undefined. *See* Md. Health Occupations Code § 12-6C-09.1(c)(1).

109. Thus, when § 12-6C-09.1(c)(1) mandates that "a 340B manufacturer may not directly or indirectly deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug by . . . a pharmacy that is under contract with . . . a covered entity," it prohibits *any* 340B manufacturer across the country from limiting transactions between itself and a pharmacy contracting with *any* covered entity across the country, regardless of whether such manufacturer or entity has any nexus to Maryland.

110. Indeed, on its face, the Maryland law could govern a transaction between a drug manufacturer located in Illinois, its wholesaler in Kentucky, and a California pharmacy that contracts with a covered entity in Florida and that dispenses the drug to a Texas resident. Such broad reach violates the federal Constitution's prohibition under the Dormant Commerce Clause. Maryland cannot "compel manufacturers and wholesalers to act in accordance with Maryland law outside of Maryland." *Frosh*, 887 F.3d at 672.

111. In addition to directly regulating out-of-state transactions, H.B. 1056 also violates the Dormant Commerce Clause's prohibition on facially "nondiscriminatory burdens on commerce . . . that . . . clearly outweigh the benefits of a state or local practice." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 353 (2008) (citing *Pike v. Bruce Church Inc.*, 397 U.S. 137, 142 (1970)); *see also Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 155 (4th Cir.

2016) ("[e]ven where a law does not facially . . . or purposefully discriminate against interstate commerce" there is "a second analytical step, asking whether any of the law's incidental burdens on interstate commerce might still be 'clearly excessive in relation to [its] putative local benefits'" (quoting *Sandlands C&D LLC v. Cty. of Horry*, 737 F.3d 45, 53 (4th Cir. 2013)).

112.    H.B. 1056 poses a very high burden on the 340B program and national prescription drug industry as a whole.  The effect of forcing manufacturers across the country to sell to any pharmacy a covered entity chooses will be a transaction that is "fully permissible" in the state where it actually occurs becomes "subject to an enforcement action in another state (such as Maryland)." *Frosh*, 887 F.3d at 673.  The difficulty of complying with varying state regulatory frameworks heightens as more states pass different laws relating to the 340B program. *See id.*  States such as West Virginia and Louisiana have done exactly this, with material differences between their laws and H.B. 1056. *Compare* West Va. Code § 60A-8-6a (extending similar prohibitions to an "agent, or affiliate" of a manufacturer) *and* La. Rev. Stat. § 40:2883 (prohibiting a manufacturer from "prevent[ing] or interfer[ing] with *any patient's choice* to receive such drugs from the 340B entity" (emphasis added)).  As such, the 340B program may become untenable, with potential catastrophic effects for the nationwide prescription drug industry. *See EXCLUSIVE: The 340B Program Soared to $38 Billion in 2020—Up 27% vs. 2019*, Drug Channels (June 16, 2021), *available at* https://www.drugchannels.net/2021/06/exclusive-340b-program-soared-to-38.html (analyzing HRSA data to find the 340B program accounted for "16% of . . . total U.S. gross sales of brand-name drugs at list prices" in 2020).

113.    This is all for very little benefit to Maryland.  The statute purports to be passed "for the purpose of prohibiting a 340B manufacturer from taking . . . actions to limit or restrict

the acquisition or delivery of a 340B drug." H.B. 1056. If passed to use a federal program to benefit the in-state covered entities *themselves* at the expense of out-of-state manufacturers like AbbVie, H.B. 1056 would "amount[] to 'simple economic protectionism'" that the Supreme Court recently affirmed to be an illegitimate legislative interest. *Nat'l Pork Producers Council*, 598 U.S. at 372 (quoting *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 580 (1986)).

114.    But even if passed to help ensure 340B-eligible patients receive discounts on their prescription medications, H.B. 1056 will actually have the opposite effect. Manufacturers, no longer able to impose conditions on who actually receives their drugs, will be unable to stop abuses of the replenishment model that result in covered entities requiring "insured patients to pay *more* for their prescriptions at contract pharmacies so the covered entity can generate 340B funds." Peter J. Pitts & Robert Popovian, *340B and the Warped Rhetoric of Healthcare Compassion*, Food & Drug L. Inst. Update Mag. (Fall 2022) (emphasis added) *available at* https://www.fdli.org/2022/09/340b-and-the-warped-rhetoric-of-healthcare-compassion/#_edn2. H.B. 1056 provides no legitimate benefit to the State of Maryland and thus cannot outweigh the high burden it places on the national drug industry and the 340B program itself.

## FOURTH CLAIM FOR RELIEF

### *Declaratory/Injunctive Relief – Due Process Clause, U.S. Const. art. XIV*

115.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

116.    The Due Process Clause of the Fourteenth Amendment provides that no State may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

117. A statute is unconstitutionally vague if it "fails to provide any standard of conduct by which persons can determine whether they are violating the statute or does not provide 'minimal guidelines to govern law enforcement.'" *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 274 (4th Cir. 2019) (en banc) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)). "Less clarity is required in purely civil statutes," *id.* at 272, because in such cases "the 'consequences of imprecision are qualitatively less severe.'" *Carolina Youth Action Project; D.S., by and through Ford v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)). However, "even laws that nominally impose only civil consequences warrant a 'relatively strict test' for vagueness if the law is 'quasi-criminal' and has a stigmatizing effect." *Manning*, 930 F.3d at 273 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-500 (1982)). A quasi-criminal statute must therefore "give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Id.* at 272 (citation omitted). Here, H.B. 1056 is not just "quasi-criminal"—because a violation of HB 1056 is an unfair, abusive, or deceptive trade practice within the meaning of the Maryland Consumer Protection Act, H.B. 1056 grants the Attorney General authority to impose outright criminal sanctions for noncompliance. *See* Md. Code Com. Law § 13-411(a).

118. H.B. 1056's provision prohibiting a manufacturer's "otherwise limit[ing]" a pharmacy contracted with a covered entity is unconstitutionally vague and does not provide drug manufacturers with fair notice as to what conduct is actually prohibited.

119. "Otherwise limit[ing]" is not defined in § 12-6C-09.1. The meaning of the word is especially ambiguous given that the District of Columbia Circuit, the Third Circuit, and

multiple federal district courts have confirmed that drug manufacturers' policies imposing reasonable conditions on the provision of 340B drugs to contract pharmacies are lawful under Section 340B (yet such policies are prohibited under § 12-6C-09.1).

120.    H.B. 1056 does not define the term "contract pharmacy" or "pharmacy," or what it means for a pharmacy to be "otherwise authorized by the covered entity" outside of a contract pharmacy relationship.  Because the application of H.B. 1056 may theoretically apply to any pharmacy nationwide if even a single Maryland resident receives drugs from that pharmacy, manufacturers have no way of predicting or understanding the scope of H.B. 1056's prohibition on "otherwise limit[ing]."

121.    Imposition of criminal penalties in the face of such uncertainty is exactly the kind of harm the rule for lenity seeks to prevent.  *United States v. Santos*, 553 U.S. 507, 514 (2008) (finding that "[t]his venerable rule . . . vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed.").  "[W]here a statute imposes criminal penalties, the standard of certainty is higher and the statute can be invalidated on its face 'even where it could conceivably have . . . some valid application.'"  *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012) (citation omitted).  Where ambiguous, the court must "construe [a] criminal statute strictly and avoid interpretations not clearly warranted by the text."  *United States v. Hilton*, 701 F.3d 959, 966 (4th Cir. 2012) (quoting *WEC Carolina Energy Solutions LLC v Miller*, 687 F.3d 199, 204 (4th Cir. 2012)).  Therefore, AbbVie's implementation of reasonable conditions on the provision of 340B drugs to contract pharmacies does not "otherwise limit the acquisition of a 340B drug" under H.B. 1056.  Any other application of H.B. 1056 would facilitate prosecutions

in the face of ambiguous statutory language and "turn[] the rule of lenity upside down." *Santos*, 553 U.S. at 519.

122. To the extent H.B. 1056 is not preempted and does not unconstitutionally appropriate AbbVie's property for private use, then it is unconstitutionally vague on its face. The provision prohibiting manufacturers from "otherwise limit[ing]" a covered entities' relationship with contract pharmacies fails to provide fair notice as to what is prohibited. Persons of common intelligence must guess at its meaning and may well offer vastly different yet reasonable interpretations of its scope. This is especially concerning given the act's criminal penalties and its potential to reach speech as well as conduct. To the extent it is not unconstitutionally vague, H.B. 1056 must be construed in *favor* of manufacturers subjected to its regulatory scheme.

## FIFTH CLAIM FOR RELIEF

### *Declaratory/Injunctive Relief –Excessive Fines Clause of the Eighth Amendment to the United States Constitution*

123. AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

124. The fines imposed by H.B. 1056 are mandatory, the fine amount is set by statute, and therefore is not speculative.

125. The fine set by H.B. 1056 is excessive in violation of the Eighth Amendment to the United States Constitution.

126. The Eighth Amendment's limitation on "the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense" applies to the States and is incorporated through the Fourteenth Amendment. *Timbs v. Indiana*, 586 U.S. 146, 151

(2019). Civil sanctions may fall within the scope of the Eighth Amendment's prohibition. *Austin v. United States*, 509 U.S. 602, 610 (1993).

127. When a civil penalty is punitive and not remedial, it is subject to the Eighth Amendment's prohibition against excessive fines if it is "grossly disproportional to the gravity of [the] offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).

128. The fine imposed by H.B. 1056 is punitive as it "can only be explained as also serving either retributive or deterrent purposes." *Austin*, 509 U.S. at 610.

129. The fine imposed is grossly out of proportion to the gravity of the conduct Maryland's law seeks to punish and deter. In the similar context of forfeitures, courts consider four factors when determining their constitutionality: "(1) the amount of the forfeiture and its relationship to the authorized penalty; (2) the nature and extent of the criminal activity; (3) the relationship between the charged crime and other crimes; and (4) the harm caused by the charged crime." *United States v. Bennett*, 986 F.3d 389, 399 (4th Cir. 2021).

130. An analysis of these analogous factors in the context of H.B. 1056 points to the conclusion that Maryland's law imposes excessive fines. On the nature and extent of AbbVie's activity, AbbVie is not engaged in inherently evil conduct that it seeks to hide from detection. The law does not seek to regulate the kind of conduct that would otherwise be difficult to detect like, for example, speeding. Maryland's law restricts manufacturers' exercise of their constitutional rights, and that conduct is permitted federal law (as both the Third and D.C. Circuits have held). In other words, apart from Maryland's law, AbbVie's conduct violates no other law. And as to harm, AbbVie's conduct seeks to stop abuses of the federal 340B program that circumvent its intended congressional scope and purpose. Refusing to provide what covered entities and contract pharmacies are not entitled to in the first place does no harm. And even

assuming there was harm, a penalty provision that requires a $5,000 per package penalty would be in some cases close to 4,000 times the supposed underlying harm in cost to covered entities and their contract pharmacies.

**PRAYER FOR RELIEF**

**WHEREFORE,** AbbVie prays for the following relief:

a.    A declaration, order, and judgment holding H.B. 1056 is preempted by federal law and unconstitutional under the Supremacy Clause;

b.    A declaration, order, and judgment declaring that H.B. 1056 effects an impermissible taking of AbbVie's property for private benefit;

c.    A declaration, order, and judgment holding that H.B. 1056 violates the Dormant Commerce Clause;

d.    A declaration, order, and judgment declaring that H.B. 1056 is unconstitutionally vague;

e.    A declaration, order, and judgment declaring that H.B. 1056 imposes unconstitutionally excessive fines;

f.    A declaration, order, and judgment holding that the 340B statute does not require drug manufacturers to provide 340B pricing to contract pharmacies or transfer or cause their discounted covered outpatient drugs to be transferred to contract pharmacies;

g.    A preliminary and permanent injunction enjoining the Maryland Attorney General or the Maryland Board of Pharmacy from enforcing H.B. 1056;

h.    An award of all costs and attorneys' fees pursuant to any applicable statute or authority; and

i.    Any other relief that this Court deems just and proper.

Dated:  August 12, 2024

Respectfully submitted,

_/s/ Timothy F. Maloney_

Ashley C. Parrish (*pro hac vice* forthcoming)
John D. Shakow (*pro hac vice* forthcoming)
KING & SPALDING LLP
1700 Pennsylvania Avenue N.W.
Suite 900
Washington, D.C. 20006
Telephone: (202) 626-2627
Email: aparrish@kslaw.com

Matthew S. Owen, P.C. (*pro hac vice*)
Meredith Pohl (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Email: matt.owen@kirkland.com
       meredith.pohl@kirkland.com

Nicole Bronnimann (*pro hac vice* forthcoming)
KING & SPALDING LLP
1100 Louisiana, Suite 4100
Houston, TX 77002
Telephone: (713) 276-7402
Email: nbronnimann@kslaw.com

Timothy Maloney, Fed. Bar ID#03381
JOSEPH GREENWALD LAAKE
6404 Ivy Lane Suite 400
Greenbelt, Maryland 20770
Telephone: (240) 553-1206
Email: tmaloney@jgllaw.com

*Counsel for Plaintiffs.*